281 N.J. Super. 511 (1995)
658 A.2d 1286
KEJOO AHN, INDIVIDUALLY AND AS GUARDIAN OF HO AHN, AND AS EXECUTRIX OF THE ESTATE OF HO AHN, DECEASED, PLAINTIFF-APPELLANT,
v.
DR. CHUNG KIM AND STANLEY BIRCH, DEFENDANTS, AND THE CARRIER FOUNDATION, THE CARRIER CLINIC MEDICAL ASSOCIATION, DR. BOHDAN CEHELYK, FELICIA SCHILP, R.N., MARY MANUELLA, R.N., IRVIN KELLY, BARBARA HIGGINS, JOHN DOE AND JANE ROE (FICTITIOUS NAMES), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1995.
Decided May 16, 1995.
*514 Before Judges KING, MUIR, Jr. and EICHEN.
Michael D. Schottland argued the cause for appellant (Schottland, Aaron & Manning, attorneys; Mr. Schottland, Vincent P. Manning and Bettina E. Munson, on the brief).
Richard E. Brennan argued the cause for respondent Cehelyk (Shanley & Fisher, attorneys; Mr. Brennan, on the brief).
Leonard Rosenstein argued the cause for respondents The Carrier Foundation, The Carrier Clinic Medical Association, Schilp, and Manuella, (Hurley & Vasios, attorneys; Mr. Rosenstein, on the brief).
Stephen O. Mortenson argued the cause for respondents Kelly, Higgins and Rand (Mortenson and Pomeroy, attorneys; Mr. Mortenson, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.

I
This is a malpractice case against a psychiatric hospital, The Carrier Clinic, and members of its staff arising from the disappearance of a newly-admitted patient to an open ward on March *515 22, 1988. The patient was never found and was judicially declared dead five years later. The malpractice trial resulted in a verdict for all defendants and the plaintiff widow appeals. We find trial error requiring a reversal and a new trial.

II
The plaintiff contended that the defendants were negligent in three ways in treating this suicidal patient: (1) admission to an "open" rather than a "closed" ward with inadequate suicide precautions, (2) poor nursing supervision, and (3) ineffective security and search procedures, once the patient was discovered to have eloped.
This is the procedural background of the case. Dr. Ho Ahn disappeared from Carrier Clinic (Carrier) on March 22, 1988. On August 26, 1988 Kejoo Ahn (Kejoo), his widow, was appointed guardian of Dr. Ahn. She was also named his executrix by later appointment. One year later, on March 22, 1989, Kejoo filed a complaint against Carrier and various John Doe fictitious defendants. The complaint was filed by Kejoo in her guardianship capacity and also individually for her alleged emotional injury.
On March 15, 1990 Kejoo filed an amended complaint adding Dr. Bohdan Cehelyk, Dr. Chung Kim, Irvin Kelly, Nurse Felicia Schilp, Nurse Mary Manuella, Barbara Higgins, Stanley Birch, and retaining Joe Doe and Jane Doe (fictitious names) as defendants. Plaintiff eventually also joined as defendants two security personnel, Ellsworth Rand and Irvin Kelly. Dr. Chung Kim, of Carrier's Staff, and Stanley Birch were dismissed from the case prior to trial.
In a separate action and a March 30, 1993 plenary hearing, Dr. Ahn was declared dead pursuant to N.J.S.A. 3B:27-1.[1] The order *516 was entered on June 14, 1993 and declared Dr. Ahn dead as of March 23, 1993, five years after his disappearance. Kejoo then was appointed executrix of his estate by the Surrogate of Ocean County and qualified to bring a wrongful death action.
Meanwhile, on May 18, 1993, Kejoo had moved to amend the first amended complaint to add a claim for wrongful death and to name Carolyn Barter, R.N., as an additional defendant. In a June 17, 1993 order the Law Division judge granted the motion to add the wrongful death claim but denied the motion to name Barter as a defendant.
Trial began on October 12, 1993 before a judge and a jury. After hearing testimony from Kejoo and her child, and in camera arguments from counsel, the trial judge dismissed Kejoo's claim for emotional distress. At the close of plaintiff's case, defendants Kelly and Rand, security personnel, successfully moved to dismiss the claims against them.
On November 1, 1993 the jury found that Nurse Manuella, the nursing staff at Carrier, and the security staff were negligent. The jury exonerated Dr. Cehelyk, Nurse Schilp and security officer Higgins. However, the jury found, by a 7-1 vote, in answer to a special interrogatory, that plaintiff failed to prove causation and wrongful death, i.e., that Dr. Ahn committed suicide *517 shortly after leaving Carrier. Judgment was entered for all defendants on November 16, 1993.

III
We review the facts as presented to the jury. Dr. Ahn was born and educated in Korea, where he served as a medical officer with the Air Force of the Republic of Korea. In 1974 Dr. Ahn emigrated to the United States with his wife. He served a residency in anesthesiology at Allegheny General Hospital in Pittsburgh. Following his residency, he was employed as a staff anesthesiologist at Misericordia Hospital in Philadelphia. He then served as a clinical fellow in the Department of Cardio-Thoracic Anesthesia at Cleveland Clinic Foundation in Ohio. After his service at the Cleveland Clinic, he served as a staff anesthesiologist at Hillcrest Hospital in Mayfield, Ohio. At the time of his disappearance in March 1988, Dr. Ahn had served as a staff anesthesiologist at Community Memorial Hospital in Toms River since the fall of 1984. He earned between $195,000 and $240,000 per year in the three years immediately before his disappearance. Kejoo and Dr. Ahn had two children: a son born in 1974 and a daughter born in 1976. At the time of his disappearance, Dr. Ahn was age 43. His children were age 11 and 13.
Kejoo's trial testimony described a "very traditional" Korean-American family. For example, Kejoo testified at trial that, except between a husband and wife, Korean men do not discuss important topics with Korean women and vice versa. She also said that Dr. Ahn felt more comfortable with a Korean doctor than an American doctor. Her English was erratic and she misunderstood many common words.
Kejoo testified regarding Dr. Ahn's mental state prior to his admission to Carrier. She stated that Dr. Ahn's depression began "before 1987," that he worried and felt he was "hopeless" and "useless." According to Kejoo, Dr. Ahn "blamed himself" for everything. Dr. Ahn, a nurse and another doctor had been sued for malpractice during his term of practice in Ohio. Although this *518 suit settled in 1987, Dr. Ahn continued to worry about the case. Kejoo testified that he believed that he was a "bad doctor." The doctor also worried about an IRS investigation into a "tax shelter," by a group of doctors which purchased two CAT scan machines. Kejoo testified that her husband believed that the "[g]overnment comes to my house, take everything, so we are going to be, not have nothing." Although Dr. Ahn was assured by a friend employed by the IRS that the problem was "not that big deal, just not that much money, a little money we could pay," her husband continued to worry.
In January 1988, according to Kejoo's testimony, her husband began seeing Dr. C.N. Kim, a psychiatrist in Clifton. At Dr. C.N. Kim's office, Dr. Ahn excused himself from the waiting room to use the restroom. After a time, Kejoo went to the restroom to check on her husband because "he didn't come out." When he did not respond to her knock, she opened the door and discovered Dr. Ahn trying to hang himself with his belt. Dr. C.N. Kim placed Dr. Ahn on medication and told Kejoo to "watch him carefully."
Kejoo testified that from that time on either she, her son, or her daughter stayed with Dr. Ahn. Kejoo claimed, after that incident, Dr. Ahn began getting better. He jogged and went back to work after taking nearly two months off. However, two or three weeks after returning to work, Dr. Ahn was "on call" one night when one of his patients died. The next morning Kejoo saw a "change" in Dr. Ahn. He again claimed that everything was "his fault" and that he was not a good doctor. Dr. Ahn called Dr. Lee, a family friend (and possibly a relative), who stayed with Dr. Ahn that entire day, a Sunday. Dr. Lee then told Kejoo that her husband should go to Carrier. Dr. Lee called Carrier and arranged for Dr. Ahn's admission on Tuesday. There was testimony that Dr. Ahn also called and confirmed the arrangement with Carrier before being admitted. Kejoo and her children and a friend of the family assisted in "watching" Dr. Ahn until the admission to Carrier.
On March 22, 1988 Kejoo drove her husband to Carrier in Montgomery Township. Kejoo testified that Dr. Ahn threatened *519 suicide in the car on the way to the clinic. Upon their arrival at Carrier, Dr. Ahn and Kejoo both signed admission papers. Dr. Ahn was a "voluntary" admission to Carrier. He was not committed involuntarily.
At Carrier, Dr. Ahn was examined on admission by Dr. Bohdan Cehelyk, a staff psychiatrist with the Carrier Clinic Medical Association. Dr. Cehelyk's deposition was read into the record during the plaintiff's case by plaintiff's counsel. In the deposition, Dr. Cehelyk was questioned about the report he prepared during his admission interview of Dr. Ahn. Dr. Cehelyk noted in his report that Dr. Ahn had a prior history of depression in Korea while in medical school which was resolved through spontaneous remission. Cehelyk's report stated that Dr. Ahn was "[w]ell until October of 1987" and that he subsequently became "progressively more depressed." The doctor also noted that Dr. Ahn had been placed on "Desyrel 400 milligrams with benefit." Cehelyk's report also stated that Dr. Ahn had returned to work three weeks before the admission and that the depression had recurred with "suicidal ideations." Although both Dr. Ahn and Kejoo were present during the examination, Cehelyk could not remember whether any information was obtained from Kejoo. Kejoo claims that no one asked her anything. She apparently had no part in the admission interview, probably because of cultural habits.
Other notations in Cehelyk's report included his observations that Dr. Ahn's eye level reflected that he was "tense with agitation," "obsessing [about] being a lousy person," and that he believed "things [weren't] going to work out." Cehelyk's report also noted that Dr. Ahn had "suicidal ideation," i.e., "a thought of hurting yourself." Cehelyk diagnosed Dr. Ahn's condition as "major affective disorder, depressed."
Later, Cehelyk testified in person that his report also recorded Dr. Ahn had no family history of suicide and he had not previously actually attempted suicide but instead just had "thoughts" of suicide. Although plaintiff's expert psychiatrist, Dr. Verdon, testified that Dr. Ahn's father committed suicide, there was no evidence *520 that Cehelyk was provided with this information. Cehelyk also testified that suicidal ideation is "extremely common" in depressed patients. The plan of treatment on admission for Dr. Ahn was to place him in an "open" unit, give him dining room, gym, and "pool-hall" privileges, and to schedule him to meet his treating psychiatrist the next day.
Cehelyk also testified regarding a medical form which Carrier required the patients to fill out before being taken to a unit. On this medical form, Dr. Ahn had written under "current complaints" that there was a previous "suicidal attempt." However, "attempt" was crossed out and "idea" added. Cehelyk's own dictated report stated that "[t]he patient did admit to suicidal intention, but denied suicide attempts." However, Cehelyk claims that the use of the word "intention" was a "typo" and that the correct word dictated was "ideation."
Kejoo testified that after Cehelyk's examination of Dr. Ahn, they were taken to Dr. Ahn's room, where a "guard" checked his belongings. Kejoo stated that the guard removed Dr. Ahn's razors "because of danger." However, the guard did not remove Dr. Ahn's belt from his belongings. Kejoo testified that she was worried about the belt and asked the guard why she did not take it. She claims that the guard only said "No."
When Dr. Ahn was assigned to his room, between noon and 1 p.m., Carolyn Barter was the nurse in charge of the open unit to which he was assigned. Barter filled out a "Nursing Admission Progress Note" in which she noted that Dr. Ahn was "quite depressed. Never smiled during interview." She also noted that Dr. Ahn had "been having `suicidal thoughts,' but no plan. Says he wouldn't hurt himself in the hospital  `only at home.'"
Kejoo testified that after the room and personal belongings check, she obtained a "public phone number" which she was told could be used to call Dr. Ahn later. Kejoo testified that she and Dr. Ahn then went to lunch in the clinic cafeteria.
*521 Kejoo left the clinic at 1 p.m. and returned home in time for her children to arrive from school. Dr. Ahn was sitting in front of the nurses station when she left. Kejoo testified that she worried about "the belt" and telephoned Dr. Ahn's personal psychiatrist, Dr. C.N. Kim, when she arrived at home to discuss her concern. Dr. Kim told her "[d]on't worry." Kejoo then called Dr. Lee, who told her that he called Carrier and that everything was fine. Note that there are two Dr. Kim's  Dr. C.N. Kim, Dr. Ahn's personal psychiatrist, and the defendant, Dr. Chung Kim of Carrier's staff. Cehelyk testified that Dr. Chung Kim would have been Dr. Ahn's treating psychiatrist at Carrier, that the two Dr. Kim's probably knew each other, and there was a "professional referral." Kejoo testified that she and the children had dinner and the children went to an orchestra rehearsal from 7 p.m. to 8:30 p.m. After returning, at about 8:40 to 8:45 p.m., Kejoo claimed that she wanted her children to talk with Dr. Ahn; she telephoned the number she obtained earlier at the clinic and asked the woman who answered the phone if she could speak with her husband. According to Kejoo, the woman identified herself as a nurse and asked her to "hold on." The nurse then told Kejoo that "your husband is not with us."
Although Carrier claims that they called Kejoo and informed her of her husband's elopement, Kejoo insisted that she telephoned Carrier to speak to her husband and was informed during that telephone call that he was missing. Apparently, Kejoo was so distraught that defendant Schilp, the nursing supervisor, asked local police to check on her. Kejoo testified that she has not spoken to or seen her husband since leaving him at Carrier.
Nurse Manuella replaced Nurse Barter at 3 p.m. as the nurse in charge of the unit. Nurse Manuella last saw Dr. Ahn at 4 p.m. Dr. Ahn's roommate last saw him at 5 p.m. This was the last time Dr. Ahn was seen by anyone.
Dr. Chung Kim, who was Dr. Ahn's proposed treating psychiatrist at Carrier, testified that she was telephoned by Dr. Ahn's personal psychiatrist, Dr. C.N. Kim, about 4 p.m. Dr. Chung Kim *522 stated that Dr. C.N. Kim had received a phone call from Kejoo. As a result of Dr. C.N. Kim's call, Dr. Chung Kim finished a counselling session and "decided to go meet with Dr. Ahn." Upon arriving at about 5:30 p.m., Dr. Chung Kim looked at the admissions records on the floor and then asked the nurses to page Dr. Ahn. According to Dr. Chung Kim, Dr. Ahn did not respond to several pages and nursing assistants were sent to look for him. Carrier's security staff was not informed during this time. Security was notified of Dr. Ahn's absence at about 8 or 8:15 p.m., allegedly after Nurse Manuella called Schilp, the nursing supervisor.
Carrier is situated on 400 acres of plowed fields and woods. According to the plaintiff's brief, the area surrounding Carrier is "semi-wild and sparsely populated, consisting of some open fields, heavily wooded areas, and the miles-long Saurland Mountains to the west, a good portion of which was never searched." To the east of the clinic, about a mile away, is State Highway 206, a heavily traveled road, and the town of Belle Meade.
Carrier security initially searched the roadways only. Two security officers, Rand and Higgins, were on duty when Dr. Ahn's elopement was discovered. Carrier normally had three security personnel on duty during the shift on which Dr. Ahn disappeared. Security Officer Higgins performed a 45-minute road search while Security Officer Rand watched the admissions desk, allegedly at Higgins' request. The defense claimed it was necessary for Rand to stay at the admissions desk because "visitors were leaving the hospital at that time."
Higgins admitted in her testimony at trial that she knew Dr. Ahn was suicidal when she began the search. Higgins also said that she actually had no authority to force a voluntary patient like Dr. Ahn to return to Carrier if he refused to come back. However, if an eloped, voluntary patient refused to return to the clinic, Higgins testified that she was to "contact the nursing unit that the patient was residing on and nursing personnel then step in and *523 assess ... if nursing staff feel the patient can be a danger to themselves or others and a possible [involuntary] commitment."
According to Higgins' testimony, Schilp first notified the Montgomery Township Police Department of Dr. Ahn's elopement at 8:55 p.m. Finally, at about 9:15 p.m., Higgins called Carrier's director of security, Irvin Kelly, to notify him that a patient was missing. Although Kelly came to the clinic, Higgins apparently remained "in charge" of the search. Carrier alleged that Higgins was placed in charge of the search by Carrier's director, Stanley Birch, because she had been employed by the clinic longer than Kelly. Plaintiff claims that Kelly "did little more than shift responsibility to his subordinate ... despite his [alleged] authorship of the Clinic's security policy and his acknowledged responsibility to `oversee' all security operations."
Several nursing assistants were enlisted to ride in two cars to assist with the road search between 9:30 and 11 p.m. Carrier's search was called off at about 11 p.m. Higgins testified that no one was sent on foot to search the grounds because the police would be coming in with dogs to search the grounds; other human scents could "throw the dogs off." Sometime between 10 p.m. and midnight, Montgomery police brought one dog and conducted a search by scent. The police terminated their search at about 12:15 a.m.
The next day, March 23, Carrier personnel conducted a "mountain search" for three hours in the afternoon. The police also continued their search. Apparently dog teams were employed again about a week later. Kejoo's family hired a private investigator and the family's church paid for a helicopter search. Airline companies and the Port Authority were contacted to determine whether Dr. Ahn could have left the country. Neither Dr. Ahn nor any item of his clothing were ever found. Dr. Ahn disappeared leaving behind in the clinic his personal items which had been in his possession: his watch, wallet, social security card, credit cards, and money. Dr. Ahn did take his jacket and glasses with him.
*524 The plaintiff filed the complaint on the first anniversary of Dr. Ahn's disappearance, March 22, 1989. The complaint alleged malpractice and included a claim for Kejoo's emotional distress. First and second amended complaints were eventually filed. The amended complaints added Dr. Cehelyk, Dr. Chung Kim, Director of Nursing Felicia Schilp, Nurse Mary Manuella, Irvin Kelly, Barbara Higgins, Ellsworth Rand, and John Doe and Jane Doe (fictitious names).
On March 30, 1993 and May 10, 1993, Judge Huber, who was not the trial judge, conducted hearings pursuant to N.J.S.A. 3B:27-1 to determine whether to declare Dr. Ahn legally dead. According to plaintiff's brief on this appeal, "[a]ll interested parties were invited to participate in that action, including the defendants in this case and Dr. Ahn's life and disability insurance carriers." In a June 14, 1993 order, Judge Huber declared Dr. Ahn's date of death as March 23, 1993. Kejoo's application to have the date of death declared retroactive to March 23, 1988 was denied. Kejoo was subsequently appointed executrix of Dr. Ahn's estate.
On May 18, 1993 plaintiff moved to amend the complaint to add a wrongful death claim and to add Carolyn Barter, R.N., as an additional defendant. The motion judge permitted the wrongful death claim but refused to add Barter as a defendant. The record before us is devoid of any indication of just what proofs plaintiff offered in the declaration of death proceeding under N.J.S.A. 3B:27-1. The defendants do not assert that plaintiff's claim in this case was in any sense precluded by the prior decision of Judge Huber in the declaratory proceeding.
Trial commenced before a jury on October 12, 1993. Defendants Kelly and Rand were dismissed on directed verdicts. On November 1, 1993 the jury returned a verdict finding nurse Manuella, Carrier's nursing staff, and Carrier's security staff negligent. Defendants' verdicts of no cause of action were returned in favor Dr. Cehelyk, Schilp, and Higgins. The jury determined by a 7-1 vote that plaintiff failed to prove Dr. Ahn *525 committed suicide "within a short space of time after his disappearance from Carrier Foundation," in answer to a special interrogatory.[2] The trial judge entered verdicts for defendants.
On this appeal plaintiff sets forth five distinct claims of error: *526 *527

*528 POINT I  THE REQUIREMENT THAT PLAINTIFF PROVE SUICIDE OF DR. AHN SHORTLY AFTER HIS ELOPEMENT FROM DEFENDANT'S FACILITY WAS ERRONEOUS AND DEPRIVED PLAINTIFF OF A FAIR TRIAL.
POINT II  THE COURT BELOW ERRED IN DENYING PLAINTIFF'S MOTIONS TO AMEND THE COMPLAINT TO NAME CAROLYN BARTER, R.N., AS A DEFENDANT, BOTH BEFORE AND DURING TRIAL.
POINT III  THE COURT BELOW ERRED IN DISMISSING PLAINTIFF'S CLAIMS AGAINST DEFENDANTS KELLY AND RAND AT THE END OF PLAINTIFF'S CASE.
POINT IV  KEJOO AHN HAD AN INDEPENDENT CLAIM FOR NEGLIGENCE AGAINST ALL DEFENDANTS. THE TRIAL COURT ABUSED ITS DISCRETION IN DISMISSING THAT CLAIM ON MOTION IN LIMINE.
POINT V  THE TRIAL JUDGE PREJUDICED PLAINTIFF'S CLAIM ON PERTINENT RULINGS DURING THE TRIAL.

IV
As a subsection of her first claim of reversible error, plaintiff contends that the judge "committed a prejudicial error by charging the jury on the presumption against suicide." We agree. The judge's charge to the jury said:

*529 You, as jurors, are not to presume that Doctor Ahn committed suicide. There is a presumption against suicide. It's based upon the fact that people ordinarily cling to life and it's against human nature.
However, this presumption is a presumption which may, by sufficient evidence, be overcome, and suicide shown as what probably happened in this matter, and this has to be proven by a preponderance of the evidence as I indicated before.
The plaintiff has offered testified [sic] on this issue. It's up to you to determine whether the evidence is such that the manner of suicide has been proven despite the fact that there is a presumption.
Plaintiff's counsel timely objected to this aspect of the jury instruction: "I have to object to the use of presumption against suicide, I indicated that to you before." R. 1:7-2.
The question was last examined by our highest court in Flanagan v. Equitable Life Assur. Soc. of U.S., 14 N.J. 309, 312, 102 A.2d 35 (1954), a suit on a life insurance policy with a defense of suicide. The Supreme Court stated that "Domanowski v. Prudential Ins. Co., 116 N.J.L. 247, 182 A. 906 (E. & A. 1936), pointedly holds that a presumption against suicide is not evidence and should not be treated as such by a jury in considering its verdict." The Court announced that the "rule as so expressed has frequently been proclaimed," id., citing Dunn v. Goldman, 111 N.J.L. 249, 168 A. 299 (Sup.Ct. 1933); the Court extensively quoted Kirschbaum v. Metropolitan Life Ins. Co., 133 N.J.L. 5, 42 A.2d 257 (E. & A. 1945), as we also do.
The remaining exceptions argued before this court are directed to the court's charge. In the course of that charge the court said to the jury: "You must be governed in your deliberations by the evidence that is before you, but if the evidence is evenly divided, you may take into consideration in your deliberations the fact that there is this presumption against the fact that any one would deliberately take their own life by their own hand."
In so instructing the jury the trial judge disregarded the rule as settled by our adjudications. In Dunn v. Goldman, 111 N.J.L. 249 [168 A. 299], the Supreme Court speaking through Mr. Justice Perskie said that "a presumption is not evidence but merely a rule about evidence." This court held in Domanowski v. Prudential Insurance Co., 116 [N.J.L.] 247 [182 A. 906], that "a presumption is applied by the court in a proper case to make that quantum of proof that, without which, the court would be obliged to nonsuit or direct a verdict. * * * A presumption is not evidence and cannot be treated as evidence by the jury in reaching a verdict." Dunn v. Goldman and Domanowski v. Prudential Insurance Co., supra, were cited in support of the proposition that a presumption is not evidence in the case of Aydelotte v. Metropolitan Life Insurance Co., 124 [N.J.L.] *530 266 [11 A.2d 122], and Carroll v. Prudential Insurance Co., 125 [N.J.L.] 397 [15 A.2d 810], both decisions of this court. The statement that a presumption is not evidence to establish the presumed fact is meaningless if the jury is instructed that it may take the presumption into consideration. While there may be a conflict of authority in other jurisdictions as to whether the presumption against suicide has any probative force and is to be weighed by the jury (Cf. annotation in 103 A.L.R. 185) the rule is settled in New Jersey that the presumption is not evidence and consequently is not for the jury to consider. As stated in the Domanowski case, supra, the presumption is for the use of the trial court in determining whether a prima facie case has been established so as to justify the trial court in requiring the defendant to come forward with evidence at the peril of suffering a direction of a verdict against him, if he fails to do so. That this, the settled law in New Jersey, is the sound rule finds support in the recommendations of the American Law Institute as embodied in its Model Code of Evidence, Rule No. 704, and the comment thereunder reading: * * *
[Id. at 8-9, 42 A.2d 257.]
See N.J.R.E. 301; Magich v. John Hancock Mutual Life Ins. Co., 32 N.J. Super. 33, 38, 107 A.2d 665 (App.Div. 1954) ("The presumption against suicide is not evidence, but it does require the opposing party to bring forth evidence to overcome it.") If there is some evidence presented for the jury's consideration on the issue of suicide, "the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule." Kirschbaum, supra, 133 N.J.L. at 10, 42 A.2d 257, citing Wigmore on Evidence § 2491. See also N.J.R.E. 301.[3]
*531 The judge's charge on the presumption against suicide was particularly damaging in this case because the plaintiff Kejoo Ahn had the burden of proving a suicide reasonably related to the alleged malpractice of Carrier and its staff on March 22, 1988. The insertion of the legal presumption into the equation and the need for plaintiff to overcome it as part of her shouldering the customary burden of proof cannot be overlooked as harmless in this context. The judicial thumb, unevenly, was laid on the very delicate balance scale in this unusual case.

V
Plaintiff claims that the court erred in denying her motions, made before and during trial, to add Carolyn Barter, R.N., as a defendant. Barter was the nurse in charge of the unit when Dr. Ahn was admitted at 1 p.m. She went off duty at 3 p.m. She filled out the "Nursing Admission Progress Note."
Plaintiff's counsel did not seek to name Barter until March 1993. He candidly admits this was "a result of oversight by counsel." The original complaint in March 1989 named Carrier and fictitious defendants. In the March 1990 amended complaint plaintiff added Cehelyk, Kim, Schilp, Manuella, Kelly, Higgins and Birch, and retained John and Jane Doe as defendants.
Plaintiff's counsel urges that there was no prejudice because he had deposed Barter in 1990 and defendants also had deposed the experts who commented on her conduct. The defense claims prejudice in preparing a late defense for her personally. We see no abuse of discretion in refusing to add Barter in the survival and personal injury actions. Plaintiff should have named her in March 1990, along with all the others, in the exercise of "reasonable diligence." See Pressler, Current N.J. Court Rules, comment on R. 4:26-4; Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 299 A.2d 394 (1973).
However, we see no justification for refusing to permit Barter's addition to the wrongful death action which could not have been filed anyway until March 1993 because no one was qualified to sue. *532 The defense counters that the statute of limitations should bar the action against Barter, if she is joined as of 1993. But see Redick v. Rohm & Haas Co., 97 N.J. Super. 58, 234 A.2d 252 (Law Div. 1967); cf., Alfone v. Sarno, 87 N.J. 99, 105, 432 A.2d 857 (1981); Krauss v. Brooklyn Fire Ins. Co., 130 N.J.L. 300, 306, 33 A.2d 100 (E. & A. 1943). On remand, the affirmative defense of statute of limitations can be pled and then adjudicated. R. 4:5-4. We conclude that the judge mistakenly exercised his discretion in denying plaintiff the right to name Barter as a defendant in the wrongful death action, when that action was first pleaded in March 1993. The joinder of Barter shall be allowed on the death action and defendant may raise the bar of the period of limitations and any other defense, if they desire.

VI
Plaintiff claimed that she had a personal claim for damages, independent of the survival and death actions, based on negligent infliction of emotional distress. She also relies on the contract with Carrier, including the payment agreement which she signed. We reject plaintiff's personal claim for damages, independent of her claims in a representative capacity, on the recent authority of Gendek v. Poblete, 139 N.J. 291, 654 A.2d 970 (1995). The requisite degree of high involvement and connection was absent here.

VIII
Plaintiff claims that the trial judge erred in dismissing her claims against the two security personnel, Kelly and Rand, personally. Recall the jury did find Carrier "negligent in its security staffing" (8-0) but exonerated security guard Higgins as to negligent conduct (8-0).
Kelly was hired in September or October of 1987 as Director of Security. He testified that his job was to "oversee all security operations, supervise the security officers. I advise hospital administration *533 on matters of security. I make recommendations, suggestions to them as far as security procedure."
Plaintiff's security expert, Colling, testified that having two security officers on duty at the pertinent time was insufficient  three was "minimum." There was no apparent "backup" arrangement. He also said that Higgins was inadequately trained. Colling concluded that the search for Dr. Ahn did not comport with recognized security standards and that the written AWOL or elopement policy "didn't tell me as a security officer or a nursing person the specifics of what should be done." He also said that the policy, as written, was not followed. There was also evidence that the search may have been terminated prematurely.
If, as Colling testified, the security manual was inadequate, the shift was understaffed, and the training was inadequate, the jury could reasonably have found Kelly negligent. He denied collaborating in or personally writing the manual, which was dated November 11, 1987, after he began employment. He said it was a "combined effort" of his "predecessor." The nursing staff AWOL policy contained a revision date of February 1988, months after Kelly came to Carrier.
In ruling on an involuntary dismissal motion, the court must "accept as true all of the evidence which supports the plaintiffs and give plaintiffs the benefit of all legitimate inferences which may be drawn therefrom.... [I]f reasonable minds could differ as to whether any negligence has been shown, the motion should be denied." Bozza v. Vornado, Inc., 42 N.J. 355, 357, 200 A.2d 777 (1964). The trial court does not consider the worth or extent of the evidence, beyond a scintilla, except to determine the evidence's existence, viewed most favorably to the party opposing the motion. Zucker v. Silverstein, 134 N.J. Super. 39, 50, 338 A.2d 211 (App.Div. 1975). The directed verdict in Kelly's favor is reversed. We see no error in the dismissal as to Rand. He apparently did what he was told by his superior, Higgins. He seemed to have no authority or control over the situation.

*534 VII
We reverse and remand for a new trial as to the defendants Carrier Foundation, Cehelyk, Manuella, Schilp, Higgins, and Kelly on the death and survival actions. Barter may be joined in the death action. We conclude that the erroneous jury instruction on the presumption against suicide irremediably tainted the jury's special verdicts, on both the negligence and causation of wrongful death issues, because the concept of suicide was such an integral part of this unusual trial proceeding. The matter is best retried in its entirety to insure a consistent and proper outcome. Since the negligence issues and causation issues "are all closely intertwined," see Acken v. Campbell, 67 N.J. 585, 589, 342 A.2d 172 (1975), this intricate situation does not admit of survival of any of the special verdicts.
In Acken v. Campbell, supra, the Court found that an error of law, an erroneous submission of a "public road" issue to the jury, tainted the entire jury finding of negligence and wilful and wanton negligence of the defendants. Indeed, the Court found that the jury's answer of a special interrogatory on plaintiff's decedent's contributory negligence in the negative did not preclude a retrial on the issue of contributory negligence on the remand. The negligence issues were so closely intertwined that all issues resolved by the jury were suspect and "argue[d] for the good sense of a reappraisal of the negligence of all parties involved." Id. at 589, 342 A.2d 172.
In the present case the jury was instructed to evaluate the alleged negligence of all defendants against the background of Dr. Ahn's likelihood of suicide. The jury was told to evaluate the standards of psychiatric care urged by the parties against the context of the disputed facts presented. This evaluation involved the claimed or denied risks of suicide in this particular case relevant to the issue of negligence on the admission procedure, the security of the patient within the hospital, and the search procedures used when he eloped. This was hard enough for the jury to consider with a clean charge. When the judge told them to do it *535 against the backdrop of an erroneous presumption against suicide which the plaintiff must "overcome," the likelihood of undue distraction from their task of weighing the evidence on negligence was too great. The presumption against Dr. Ahn's suicide should not have been on the evidentiary scales with all the other evidence for and against a suicidal death.
Our courts have ordered full retrials on remand on several occasions in other cases with interrelated liability issues. In Moraca v. Ford Motor Co., 66 N.J. 454, 460-61, 332 A.2d 599 (1975), the Supreme Court ordered a retrial on all issues in a product claim despite the jury finding at the first trial that plaintiff-driver was free of contributory negligence. The Court said: "We are satisfied that in the framework of this case the issues are not separable and that the full issue of liability, including contributory negligence, should be retried." Id. at 461, 332 A.2d 599. See also Polistina v. Polistina, 183 N.J. Super. 291, 298, 443 A.2d 1086 (App.Div. 1982); Tullis v. Teial, 182 N.J. Super. 553, 561, 442 A.2d 1039 (App.Div. 1982), for similar holdings.
Finally, we have analyzed this record as one presenting a case of the claimed suicide of Dr. Ahn shortly after he left Carrier. This is the claim for damages that plaintiff stressed at trial, especially through her expert, Dr. Verdon, who said that Dr. Ahn was "actively suicidal" and "a high risk for suicide if he left Carrier." Some mention was made at trial of the chance of accidental death through misadventure or exposure, or just "laying down to die," a passive suicide. See Gaido v. Weiser, 227 N.J. Super. 175, 545 A.2d 1350 (App.Div. 1988), aff'd, 115 N.J. 310, 558 A.2d 845 (1989). On this appeal, plaintiff claims error because the judge limited the jury's consideration of the claim to intentional, active suicide, as opposed to a wider concept of either suicide, or death by accident or misadventure due to Dr. Ahn's disabled condition, or a passive submission to self-destruction. The judge's ruling at the end of the plaintiff's case limited her to the suicide theory only.
*536 We conclude that if plaintiff wants to pursue a broader theory than suicide or intentional self-destruction on retrial, she may do so. She should make her theory clear at the outset to the judge by proposed requests to charge in advance of trial, R. 1:8-7, and precise objections to the charge as rendered, if necessary. R. 1:7-2. This comment is also pertinent to the "last chance" doctrine, see Hake v. Manchester Twp., 98 N.J. 302, 486 A.2d 836 (1985), which was embraced by the special interrogatories as submitted to the jury but was not reached for decision because of the negation of causation by the answer to interrogatory # 7. The jury must be specifically told it must find that Dr. Ahn met his death by suicide, or misadventure, or accident or exposure within a reasonable period of time after leaving Carrier, a period of time which would relate his demise to a negligent breach of duty by one or more of the defendants. If the jury cannot so find on the evidence, then its verdict should be for the defendants.
We also observe that no one has presented to us the record in the "declaration of death" proceeding before Judge Huber. We only have his order. Plaintiff makes some allusion in her appellate brief to this proceeding somehow preclusively resolving certain issues at this trial. We are in no position to evaluate this appellate claim without a record and a specific adjudication in the Law Division. No specific pleading of res judicata, collateral estoppel, or issue preclusion is called to our attention, either defensively or offensively. See R. 4:5-4; see Pressler, Current N.J. Court Rules, comment 7 on R. 4:5-4 (1995). A party who relies upon collateral estoppel must plead the claim and present to the second tribunal so much of the record of the first proceeding as may be necessary to show that the issue it seeks to exclude was "necessarily determined" in the prior proceeding. Allied Realty v. Borough of Upper Saddle River, 221 N.J. Super. 407, 416, 534 A.2d 1019 (App.Div. 1987), certif. denied, 110 N.J. 304, 540 A.2d 1284(1988); see State v. Ebron, 61 N.J. 207, 216, 294 A.2d 1 (1972).
Absent any reliance by the parties on the judgment in the declaratory proceeding on the presumption of death within five *537 years disappearance, N.J.S.A. 3B:27-1 and N.J.S.A. 3B:27-6, to establish factually any element of the cause of action or any affirmative defense on the ground of issue preclusion, we are satisfied that no reference should be made on retrial before the jury to the proceeding before Judge Huber. That proceeding established the legal death of Dr. Ahn for purposes of winding up his affairs, including bringing this action. The proceeding did not establish anything pertinent factually to the wrongful death action, especially since neither party has sought to effectively invoke collateral estoppel or issue preclusion in this case. The reason for this legal presumption of death, first at common law and now under statute, "is that it has been found necessary, on grounds of public policy, that rights depending on life or death of persons long absent and unaccounted for, should not remain in abeyance indefinitely but should be settled according to some fixed rule." 25A C.J.S. Deaths § 6 (1966); see In re Fuller's Estate, 13 N.J. Super. 327, 329, 80 A.2d 336 (Cty.Ct. 1951). We conclude that reference to the statutory presumption of death (and to Judge Huber's ruling) is no more appropriate on the retrial than reference to the presumption against suicide was. They are both procedural vehicles forged by the law to expedite human affairs where the true facts are uncertain. In this case each has demonstrated its utility. Plaintiff has been qualified after five years to bring the death action and has been forced to come forward with factual proof on the likelihood that Dr. Ahn committed suicide. She has had the advantage of the presumption of death statute. She has assumed the procedural burden of proving a suicide. Counsel cannot comment on and the judge cannot charge on the presumptions.
The force and utility of both presumptions is dissipated and they are now irrelevant to the jury. The case should be presented as a straight-forward wrongful death action with the issues of negligence and causation presented to the jury without the clutter or distraction of these legal presumptions.
Reversed.
NOTES
[1] N.J.S.A. 3B:27-1 states in full:

Death of resident or nonresident presumed after 5 years' absence.
A resident or nonresident of this State who absents himself from the place of his last known residence for a continuous period of 5 years, during which he has not been heard from, and whose absence is not satisfactorily explained after diligent search, or inquiry is presumed to be dead. His death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that death occurred earlier.
N.J.S.A. 3B:27-6 states in full:
Action to be brought in Superior Court.
The Superior Court may declare the absentee dead, if it is satisfied that he should be presumed dead under the provisions of N.J.S. 3B:27-1, or if it concludes from a review of the evidence, both direct and circumstantial, that the earlier death of the absentee has been established and that the death occurred prior to the institution of the proceeding before the court. A declaration with respect to a nonresident shall affect only property located within the State.
[2] The verdict sheet stated in full, with answers given to # 1 through # 7 only:

JURY VERDICT SHEET AHN V. CARRIER FOUNDATION, ET AL L-1327-89
1. Was the defendant, Dr. Cehelyk, negligent in that he deviated from accepted medical standards in connection with Dr. Ho Ahn?
 Yes ____ No X ____ 7-1
2. Was the defendant, nurse Manuella, negligent in that she deviated from accepted nursing standards in connection with Dr. Ho Ahn?
 Yes X ____ No ____ 8-0
3. Was the defendant, nurse Schilp, negligent in that she deviated from accepted nursing standards in connection with Dr. Ho Ahn?
 Yes ____ No X ____ 8-0
4. Was the defendant, security guard Higgins, negligent in her conduct in connection with Dr. Ho Ahn?
 Yes ____ No X ____ 8-0
5. Was Carrier Foundation negligent in that any other members of its nursing staff deviated from accepted nursing standards?
 Yes X ____ No ____ 7-1
6. Was Carrier Foundation negligent in its security staffing on March 22, 1988?
 Yes X ____ No ____ 8-0
If any of the above answers are YES, proceed to question #7. If all of the above answers are NO, cease deliberations.
7. Did Dr. Ho Ahn commit suicide within a short space of time after his disappearance from the Carrier foundation?
 Yes ____ No X ____ 7-1
If the answer is NO, cease deliberations. If the answer is YES, proceed to question # 8.
8. If the answer to # 1 is Yes, did the negligence of defendant, Dr. Cehelyk;
a) substantially increase the risk of death by suicide of Dr. Ho Ahn?
 Yes ____ No ____
b) was this increased risk a substantial factor in his death?
 Yes ____ No ____
9. If the answer to # 1 is Yes, did the negligence of defendant, nurse Manuella;
a) substantially increase the risk of death by suicide of Dr. Ho Ahn?
 Yes ____ No ____
b) was this increased risk a substantial factor in his death?
 Yes ____ No ____
10. If the answer to # 3 is Yes, did the negligence of defendant, nurse Schilp;
a) substantially increase the risk of death by suicide of Dr. Ho Ahn?
 Yes ____ No ____
b) was this increased risk a substantial factor in his death?
 Yes ____ No ____
11. Did the negligence of any other member of the nursing staff;
a) substantially increase the risk of death by suicide of Dr. Ho Ahn?
 Yes ____ No ____
b) was this increased risk a substantial factor in his death?
 Yes ____ No ____
12. If the answer to # 4 is Yes, did the negligence of defendant, security guard Higgins, result in the loss of a substantial possibility of finding Dr. Ho Ahn?
 Yes ____ No ____
13. Did the negligence of Carrier Foundation in its security staffing on March 22, 1988 result in the loss of a substantial possibility of finding Dr. Ho Ahn?
 Yes ____ No ____
If any of the answers to questions # 8 through # 13 are YES, proceed to the next question. If none are YES, cease deliberations.
14. If more than one answer is YES to questions # 8 through # 13, give the percentage of negligence of each.
 Dr. Cehelyk ____%
 Nurse Manuella ____%
 Nurse Schilp ____%
 Carrier Foundation (other nurses conduct) ____%
 Carrier Foundation (security staffing) ____%
 Security Guard Higgins ____%
 TOTAL 100%
15. What amount of money will compensate the Estate of Dr. Ho Ahn for the death of Dr. Ho Ahn?
 $ ____

[3] N.J.R.E. 301 states in full:

Except as otherwise provided in Rule 303 or by other law, a presumption discharges the burden of producing evidence as to a fact (the presumed fact) when another fact (the basic fact) has been established.
If evidence is introduced tending to disprove the presumed fact, the issue shall be submitted to the trier of fact for determination unless the evidence is such that reasonable persons would not differ as to the existence or nonexistence of the presumed fact. If no evidence tending to disprove the presumed fact is presented, the presumed fact shall be deemed established if the basic fact is found or otherwise established. The burden of persuasion as to the proof or disproof of the presumed fact does not shift to the party against whom the presumption is directed unless otherwise required by law. Nothing in this rule shall preclude the judge from commenting on inferences that may be drawn from the evidence.